# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Melissa Somosky<br><br>       Plaintiff,<br><br>   v.<br><br>The Consumer Data Industry Association<br><br>      Defendant. | Case No. 20-cv-4387<br><br><br><br>**<u>COMPLAINT</u>** |

## <u>PRELIMINARY STATEMENT</u>

In June of 2019, Stacy Slaughter from the FTC arrived at the headquarters of the Consumer Data Industry Association ("CDIA") to deliver a talk.  She reminded the audience that the last time they met, they had been discussing an FTC report finding, *inter alia*, that 20% of credit reports were inaccurate (including one bureau that had accidentally labeled thousands of persons as terrorists).  Things had not improved, and earlier that year, senior members of Congress had said they needed to think about tearing down the credit reporting system and starting from scratch because it had become an anticompetitive oligopoly.  The situation was so embarrassing that Senator Kennedy(R-LA) had ordered Slaughter's boss to "get with" the Bureaus and come up with a system that "resembled something someone would do on purpose."  Slaughter enumerated four issues that had to be addressed, including a modicum of good faith for consumers: "a policy of 'when it doubt, keep it out.  If there was any question, CRAs should be erring on the side of consumers and keeping out or deleting that information, not erring on the side of furnishers or clients."  Everyone seriously needed to "***do better***."

## I.  PARTIES

### A.  Plaintiff

1.  Melissa Somosky is an individual and a resident of this district.

### B.  Defendant

2.  The Consumer Data Industry Association ("CDIA") is a trade association founded in Rochester, New York with its principal place of business in Washington DC.   The CDIA has subjected itself to the personal jurisdiction of this Court through the operation of an illegal monopoly that harms the welfare of the citizens and businesses of this State.

## II.

### JURISDICTION AND VENUE

3.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

4.  Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred in this District and Defendant is subject to this Court's personal jurisdiction.

## III.

### STATEMENT OF FACTS

### The Consumer Data Industry

5.  The original credit report was written on an index card that one highly organized grocery store owner would share with other merchants for a fee.  Whether the story is apocryphal or not, credit reporting began as a largely informal method for local businesses to know who in town could safely be extended credit.

6.      This was an important tool for a society that was becoming increasingly mobile, fragmented, and transient.

7.      Early versions of credit reports were not simply records of whether you paid your bill on time, but whether someone was married, how long someone had lived in their house, etc.

8.      By the late 1960s, there were more than 1500 local agencies that specialized in providing this type of credit information.  And in 1970, Congress recognized that "the banking system is dependent upon fair and accurate credit reporting."  In order to safeguard this information, Congress passed the Fair Credit Reporting Act which sought to govern three industries that were collaborating on the finished product: persons providing the data such as lenders and credit card companies ("Data Furnishers"), persons about whom the data was provided ("Consumers"), persons aggregating, organizing, and selling the data such as Experian and Equifax ("CRA" or "Credit Bureau"), and the individual's consumer file containing all her data ("Credit Reports").

9.      The FCRA required the industry to adopt and employ "reasonable procedures" to ensure that Credit Reports were prepared with the "maximum possible accuracy."  Contrary to industry lore, this is actually a rather flexible command that mandates only a sincere attempt to do the best job possible with the tools available.

10.     Soon after the FCRA was passed, the CDIA took over designing procedures that would be used by all the CRAs and Data Furnishers ("Metro Guidelines" or "Consumer Procedures").

11.     Industry insists that this uniformity was necessary to ensure efficiency and consistency.  And while everyone knows the hassle of converting a PC file into a Mac, since consumers do not enter the data themselves, the efficiencies inured only to the Data Furnishers and CRAs and at the expense of consumers, as will be shown.

12.     The Metro Guidelines conceived of the Credit Reports through mosaic evolution: Data Furnishers would supply individual data points that would be aggregated into an image representing a person's credit-worthiness.  Credit Reports were broken down into trade lines, and trade lines were broken down into data fields, along with seven years of monthly payment history. And with each new data point, the image would become more nuanced and comprehensive.

13.     In 1997, the CDIA issued amended guidelines called "Metro2," which are still in use today.  Metro2 controls the formatting and reporting for approximately 2.6 billion tradelines belonging to over 200 million consumers that have been reported by more than 30,000 Data Furnishers.

### Consumer Procedures

14.      But it is not nearly so comprehensive or impressive as that sounds.

15.     For starters, Metro2 Guidelines are updated occasionally but we do not know how often because they are kept under tight security. We do know there is a 2011, 2013 and a 2019 version but Data Furnishers are not required to use any specific year's Guidelines.



16.     In fact, one of the largest student loan Data Furnishers currently uses the 2011 Guidelines and Experian reportedly continues to use the whatever Metro2 Guidelines were in existence at the time any given data point was first entered.  That means that if a consumer defaulted on a debt in 2011, the CRA will continue reporting that data point using the 2011 Guidelines even if a later version of Metro2 contains new procedures that might improve accuracy.

17.     Data Furnishers are allowed to report as much or as little information as they choose and the vast majority of fields are never filled in. Owing to this lack of discipline, the FTC reports that 42 million consumers have errors in their credit reports, and 10 million have errors that can be life altering.

**"What I see here is an oligopoly. I don't see that vibrant competition which is needed for these agencies to actually help consumers," Congressman Patrick Henry**

18.      The CDIA, however, insists that 98-99% of Credit Reports are free of errors—with the caveat that "errors" are defined as only those mistakes "*that could have a meaningful impact*."

19.     Thus can 40 million errors be hidden behind two little words: "meaningful impact."

20.     Somosky's Credit Report, for example, currently list her student debt as 'included in bankruptcy 2013' but the tradeline is scheduled to remain on her report until 5/2026—seven years longer than allowed by law.  The 'Pay Status' is listed as 'paying as agreed,' despite the last payment having been reported in April 12, 2019 and future payments have been 'deferred.'

21.     The. CRAs will not acknowledge any of these issues because the CRAs

**"In 2012, the Federal Trade Commission published a study that found that 20% of consumers found errors on at least one of their credit reports. Many of those consumers were planning to continue to do battle with the CRAs, but 50% planned to just give up."**

acknowledge only three types of errors: immaterial errors, helpful errors, and idiosyncratic errors.

22.     **Immaterial Errors.** Somosky's data field for credit limit on the student loan is blank.  This is an error because the student debt had a credit limit.  But the CRAs insist that, "the exclusion of credit limit information in a credit file tradeline does not result in any meaningful change in the credit score for a substantial majority of consumers."

23.     **Helpful Errors.**   Transunion reported that the student debt was included in bankruptcy in 2013 but also that Somosky is "paying as agreed."  That is internally inconsistent and allows the trade line to continue being reported long after it should have been erased. But the CRAs will insist that this is not really a problem because keeping this trade line on the report probably improves her score for at least two reasons: having a few years of positive payment data is always good and having a thicker credit file with an older, open, and active account is also always good.

**"Credit reporting agencies operate totally in the dark. They sell personal data about consumers, often get it wrong or leave it exposed to hacks, and then charge people to fix the agencies' mistakes."**

24.     **Idiosyncratic Errors.**   Student loans are the second largest category of consumer debt, and despite the significant differences between private student loans and federal student loans, and between qualified education loans and non-qualified education loans, Metro2 lumps all the various types of student loans together into a single category: "education loan." And when asked why Metro2 does not have any sort of way to differentiate, agents for the CDIA's have said, "when you are managing and organizing literally billions of pieces of credit information with algorithms, something as idiosyncratic as student loans wouldn't warrant such an approach."

**"Since 1989, I have observed the arrogant attitude of the CRAs. They've always claimed that mistakes, let alone credit problems, aren't their fault; they simply report what they are told."**

25.     For the CRAs, the only thing that matters is what the Data Furnisher says.  To use an admittedly facile analogy, in a game of telephone that begins with the statement "John's brother paid his Visa today" and ends in "Ron's mother Lisa was born in May," the CRAs believe that a Credit Report is accurate if Lisa's Credit Report lists her birthday in May and that she has a son named Ron because "for a credit bureau, accuracy means that the contents of a consumer's credit files are consistent with the actual credit information for that consumer as reported by the lenders and creditors."

**"Many consumers were planning to continue to do battle with the CRAs, but 50% planned to just give up."**

26.     And if 98% of Credit Reports are accurate, then all but 2% of lawsuits are meritless and are met with vehement opposition that most often become an *ad hominem* against the consumer.  For example, the real reason a consumer is denied credit is probably not inaccuracy in the Credit Report, but instead the consumer's lack of ambition, and the CDIA's agent has testified that,  "were building a positive credit reputation truly a priority, we should have seen evidence in the form of securing reliable and stable employment for an extended period of time."

27.     The industry has set expectations so low that everyone has begun to accept that the CRAs are fundamentally ineffectual. And it is no wonder Congress is saying "think that we need to start thinking about how we reimagine it and rebuild it from the ground."

**"In a 2017 supervisory report, the CFPB also found that in cases where consumers had submitted documentary evidence in support of a dispute, "one or more credit bureaus failed to review and consider the attached documentation and relied entirely on the furnisher to investigate the dispute. This is not exactly evidence of a dramatically improving industry."**

28.     But it is not hard to imagine what sort of things could be done in credit reporting given technological advances.

29.     And we need not imagine it—because it already exists.  An entire credit reporting industry has grown up around the siding of the FCRA and has solved nearly every problem complained about under the FCRA

**Enterprise Procedures**

30.     The banking industry today does not depend upon the information provided in Credit Reports issued under the Metro2 Guidelines.  Instead, there is an entirely separate subindustry working round the clock to solve the problems created by Metro2 and give businesses accurate and useful information ("Enterprise Procedures" or "Enterprise Guidelines").

31.     On the Enterprise side of the business, competition is rough, new technology is harnessed, and the CRAs integrate products designed and built by third parties. The CRAs work hard to solve problems, even those that nobody ever expected them to solve

**"A system that looks like somebody designed it on purpose so that consumers can say, hey— you got my information wrong, please fix it, and then they'll do it, as opposed to saying you don't pay our fees, business guys pay our fees, so call somebody who cares," Senator Kennedy (R-LA).**

32.     The first thing one notices is the difference in attitude: there is no defeatism, and there is no desire to do the bare minimum under Enterprise.  Enterprise is not staffed with angry people spitefully ensuring nobody ever gets what they need, want or deserve. Enterprise produces an enormous literature of white papers on every imaginable nuance in credit reporting and everything is done in excess of what is required or expected. It is the fulfillment of the very thing Senator Kennedy demanded: a business that seems to be done intentionally.

33.     And the results are predictably good. For example, Enterprise does not deny that 20-30% of consumer data is wrong.  After all, these are sophisticated business customers who would not believe there is such a thing as "immaterial errors."  And rather than trying to play semantics, the CRAs went ahead and fixed the problem of inaccuracy.

34.     Data Furnishers are offered a "solution that enables you to proactively manage your reporting process.  It will flag any discrepancies against a pre-built set of rules and measure the results through an interactive dashboard and makes it easy to report on consumer debt and gives you confidence that your files will be accurate and FCRA-compliant."

35.     But this is also quite troubling. Congress imposed upon the CRAs a statutory duty to develop reasonable procedures to ensure the maximum possible accuracy of credit reports. In response to criticism, the CDIA insists that perfection is not possible. And yet the CRAs have a procedure that will make data files "accurate and FCRA-compliant," but instead of using this power to fulfill their statutory duty, the CRAs sell it to businesses as an add-on service.

36.     And that is simply the beginning.

37.     Consumers are told that a student loan reporting glitch that only affects ~300,000 persons is far too idiosyncratic to merit a new procedure.  But an Enterprise error affecting only 210,000 accounts is described as a "staggering" failure.  "Equifax identified 210,000 accounts as potential synthetic identity fraud.  These numbers are staggering when you consider there is an average of 4,000 accounts for each major lender."

38.     Enterprise admits that there is a serious problem with consumers being associated with debts they do not owe.  The CRAs actually warn debt collectors about the ~85,000 complaints each year associated with this problem.  But nowhere is it said the problem is too hard to solve.  In fact, the CRAs solved the problem: debt collectors can integrate an Enterprise Procedure into their debt collection machinery that will eliminate or at least reduce the number of errant debts.

39.     And for the highly ambitious collectors, there are also Procedures that will show the best time of day to contact each consumer and during tax season, will provide data showing which consumers historically use 10% of more of their tax refund to pay down existing debt to improve collections in the spring.

40.     Consumers are told the CRAs have absolutely no ability to conduct legal analyses to more accurately report the status of a debt.  And yet, Enterprise provides a platform that will analyze TCPA decisions in federal courts across the country—including intra-circuit splits—in order to ensure that debt collectors are not subjecting themselves to unnecessary risk in regions that historically interpret "auto-dialer" in a consumer-friendly way.

41.     Enterprise has access to troves of "undisclosed data points" on consumers including undisclosed assets, undisclosed payments, undisclosed liabilities, and undisclosed credit inquiries to track your competitors as they track consumers.  Enterprise can also be alerted to whenever a consumer loses a job, gets a new job, goes on a shopping spree or *has a health problem* so the sales teams and debt collectors can adjust their sales pitch or collection strategy appropriately.  The CRAs even boast that "we can help you successfully navigate your requirements to convert sensitive PII [personally identifiable information] data into actionable insights."

42.     Enterprise is provided with interactive tools showing consumer sales measured against foot traffic in the auto industry along with daily consumer sentiment reports.  Think about that.  Consumers cannot even expect to have their credit limit reported accurately, or at all—but businesses are provided with daily metrics on how consumers *feel* about buying a new car in rural Georgia or downtown Chicago.

43.     And contrary to what the Bureaus tell consumers, *credit limits turn out to be highly material information*. "The ratio of total outstanding balance to total credit limit for all revolving credit heavily influences as much as 30% of one's generic credit score."

44.     And it goes on and on and on. Consumer Procedures account for only 40% of a CRAs' business—the other 60% of revenue is earned through Enterprise Procedures. Said another way, the CRAs devote most of their time and energy solving problems for additional fees.  Said another way, the CRAs have a vested financial incentive to keep the Consumer Procedures as bad and faulty as possible because they can earn money fixing those problems under Enterprise Procedures.

**Monopolistic and Anticompetitive Behavior**

45.     One of the architects of the modern free market wrote that, "people of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices."

46.     This is a reminder that for all the ugly connotation that has been invested in the  word "conspiracy," a Scottish economist who lived with his mother in a town of 50,000 people had no trouble imaging that most merchants in the community were either engaged in an active conspiracy or were simply waiting to be invited to join.

47.     The CDIA is a single organization that controls more than 90% of the marketplace for credit reporting procedures.

**"Normally, in our free market system, we count on competition to provide innovation and improved options for consumers. But in the consumer data market, firms don't primarily compete for consumers' business. Given that consumers do not even have the option to make a choice — even if there was robust competition among CRAs— when problems are grave and persistent, there is limited market incentive for consumer-facing improvement."**

48.     The CDIA's self-proclaimed "global thought leader" on credit reporting has testified that: "the Metro 2 guidelines are industry-wide requirements. There is a need for consistent reporting practices so that there is accuracy and consistency in scoring across all consumer reporting agencies, and so that each consumer reporting agency is not making arbitrary decisions about how to report and score credit information. It would be manifestly unreasonable for one CRA to depart from industry custom and practice utilize industry-wide data furnishing data specifications developed by the Consumer Data Industry Association ("CDIA") called Metro 2."

49.     The CDIA has no competition developing superior procedures because there is an agreement to use Metro 2 and only Metro 2, and Data Furnishers are forced to purchase membership in the CDIA before they are allowed to supply data to the CRAs.

50.     In exchange for this monopoly, the CDIA has agreed to bear the blame for all the problems Metro2 causes and will subject itself to criticism and condemnation at every Congressional hearing and spend all day every day being castigated by the FTC, which lets the CRAs spend their time developing new and innovative products that don't need to be given away for free.

51.     The CDIA controls the reporting requirements for a billion dollar industry upon which American finance is dependent.  And yet, the CDIA performs this job on an annual budget of approximately five million per year.  Of that, $3 million is for salaries, rent and benefits.  This means that less than $2 million per year could possibly be spent on R&D for the Metro2 Guidelines.

52.     For comparison purposes, Google spends $15 billion on average on R&D each year and the popular video game called "Grand Theft Auto" cost $265 million to develop. It would take more than 100 years for the credit reporting system upon which this country's banking system rests to be as sophisticated as the graphics in the country's second most popular video game devoted to role playing a car thief.

53.     There is no way to fix Metro2 with marginal changes around the edges on this sort of budget.  The only changes coming to Metro2 are more or less strips of duct tape on a fifty-year old copy machine.

54.     And it is not plausible to suggest that the monopolistic control exercised by the CDIA was acquired by business acumen when you examine the product, the complaints, and the near universal condemnation from anyone outside the conspiracy.

55.     Creative thinking has so degraded under Metro2 that the CDIA's Global Thought Leader describes the ideal credit reporting market as follows: "The optimal situation would be a *homogeneous oligopoly* with two or more bureaus competing on a *level playing field*.  Each should have similar data and be forced to compete with one another on price, value-added services, and access to payment data from non-financial sources.  If financial institutions are required to furnish lending data, then they should do so in a *competitively neutral* way."

56.     Metro 2 is like a splint left in a broken limb that has now grown into the leg and paralyzed the intended beneficiary.  And this was done intentionally as a way to avoid complying with the FCRA while having an ability to maintain plausible deniability.

57.     Experian, and Transunion, and Equifax have a demonstrated level of sophistication and innovation so utterly beyond anything contained in Metro2 that it is absurd to suggest Metro2 is the "best that can be done for consumers."

## IV.

### CLAIM FOR RELIEF

### Count One: Violation of Section Two of the Sherman Act

58.     Plaintiff hereby incorporates the allegations in the preceding paragraphs as if fully set forth herein.

59.     Plaintiff incurred several non-qualified education loans from Sallie Mae in 2005 and 2006 ("Tuition Answer Loans") while at the College of William and Mary.

60.     The Tuition Answer Loans were discharged in 2013 by this Court, and the trade lines were scheduled to be removed from her Credit Report by 2020.

61.     Sallie Mae refused to update her Credit Reports to reflect discharge of the Tuition Answer Loans, which forced Plaintiff to bring suit in this Court in 2019.

62.     Somosky thereafter entered into a confidential settlement.

63.     However, after the CRAs reported the loans were discharged in bankruptcy, they also re-aged the trade lines so that they would remain on her Credit Reports for another seven years, causing her credit score to drop by 100 points.

64.     Plaintiff submitted disputes to the CRAs, all of which were rejected.  The CRAs will not remove the negative and inaccurate remarks because the CDIA has mandated that the CRAs accept whatever information the Data Furnishers report even when that information is patently contradicted by other information in her Credit Reports, such as her lack of any bankruptcy in the last 10 years.

65.     The Sherman Act is primarily geared towards protecting consumer welfare. The CDIA's acquisition of total and complete control over the means of credit reporting has led to a disastrous environment for consumer welfare.

66.     The CDIA is engaged in anticompetitive behavior preventing the CRAs and other market participants from competing to develop new methodologies in credit reporting. But for the CDIA's monopolistic control over the credit reporting though Metro2, Somosky would not have spent the last year of her life trying to fix this problem and would have access to a competitive marketplace that would create accurate and reliable Credit Reports using reporting procedures such as those utilized by the CRAs for businesses.

67.     The aforesaid behavior constitutes exercise of monopolistic power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## V.

## PRAYER

68.     Plaintiff requests trial by jury on all issues so triable and that Defendant be cited to appear and judgment be entered against Defendant and for:

**(1)**     preliminary and permanent relief as is necessary and appropriate to restore competitive conditions in the markets affected by the CDIA's unlawful conduct;

**(2)**     Actual damages, treble damages, and punitive damages;

**(3)**     Attorneys' fees and the costs of this action;

**(4)**     such additional relief as it may find just and proper.

Respectfully submitted this ninth day of June 2020,


*/s/ Austin Smith*

Austin C. Smith
**Smith Law Group LLP**
3 Mitchell Place
New York, New York 10017
(917) 992-2121
austin@acsmithlawgroup.com